892 F.2d 82
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
CRYOGENIC ASSOCIATES, INC., Beatrice Companies, Inc.,
Plaintiffs-Appellees,
v.
STATE MEDICAL OXYGEN & SUPPLY, INC., Defendant-Appellant.
 No. 88-3812.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 2, 1989.
Decided Dec. 18, 1989.
 
 Before BROWNING, SCHROEDER and FLETCHER, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 State Medical Oxygen and Supply, Inc. (State Medical) appeals the judgment on a jury verdict in favor of Cryogenic Associates (CA) for unjust enrichment and for failure to deal in good faith. The jury reached its decision by answering a special verdict form. We uphold the jury's verdict.
 
 FACTS
 
 3
 The various companies whose actions formed the basis of this dispute all played a role in providing terminally ill patients with oxygen equipment for use in their own homes. Appellees Cryogenic Associates and its parent Beatrice manufactured and sold the equipment. Appellant State Medical and a predecessor company, Montana Medical, were medical supply service companies. They rented the equipment to individual patients and serviced the equipment for them. Indiana National Bank (INB) financed customers who purchased equipment from CA.
 
 
 4
 In 1982, CA located Montana Medical as a potential customer for its equipment. Since Montana Medical was a poor credit risk, CA arranged for INB to purchase the equipment from CA and then to lease it to Montana Medical, with an option for Montana Medical to purchase at the end of the five-year lease period. INB also loaned $600,000 to Montana Medical to finance these payments. CA promised INB that should Montana Medical fail in its obligations to INB, INB could seek recourse from CA. That promise is embodied in the Recourse Agreement of March 30, 1983.
 
 
 5
 The lease/sale agreement between INB and Montana Medical was signed on December 15, 1982. By October of 1983 Montana Medical was already four months delinquent in its rental obligations, and INB declared the lease in default. Around that same time Montana Medical negotiated a deal with the three principals of what would later be appellant State Medical. The deal contemplated a sale of the business, but in the meantime, before closing, the three principals were given the exclusive right to manage all of the assets and liabilities of Montana Medical. On October 31, 1983 the three principals filed articles of incorporation for State Medical.
 
 
 6
 Although INB had the right in October, 1983 to terminate the lease and accelerate payments due under it, it did not exercise the right, since State Medical promised to make the monthly payments. State Medical made those payments under the Montana Medical lease from November of 1983 until February of 1984.
 
 
 7
 In February of 1984, State Medical notified INB that it would not purchase Montana Medical, as initially contemplated. Instead, it would be willing to enter into a new lease under its own name for the same equipment. INB formally terminated the old lease on March 1, 1984.
 
 
 8
 During the first seven months of 1984, CA was actively trying to salvage the transaction. INB played a passive role because it was protected by its recourse agreement; unlike CA, it did not stand to lose much money should the transaction collapse. Nonetheless, all the offers and counteroffers treated the transaction as one between INB and State Medical, which it technically was.
 
 
 9
 After the termination of the Montana Medical lease in March of 1984, the parties agreed that pending negotiation of a new long-term lease, State Medical would retain possession of the equipment and would pay the monthly rent of $14,935, the sum Montana Medical had been paying. Offers and counteroffers were made in March and April of 1984, and on May 1, 1984 the terms of an apparent agreement had been worked out. State Medical would receive some new equipment and would make monthly payments of $13,095 over a five-year period. At the time of the agreement, CA was under the impression that the principals of State Medical would supply personal guarantees. But by late May it was clear that State Medical did not believe that personal guarantees were part of the bargain.
 
 
 10
 Despite the fact that the evidence at trial was to the effect that the parties had not agreed on the guarantee issue on May 1, the parties submitted the following Agreed Facts to the jury. Agreed Fact No. 12 provided:
 
 
 11
 On or about May 1, 1984, Plaintiffs and State Medical reached an agreement and thereafter substantially all the lease documents between INB and State Medical were executed by State Medical. The new lease agreement contained a reduced total price and included additional equipment[.]
 
 Agreed Fact No. 13 provided:
 
 12
 Plaintiffs and Defendants owed to each other the duty of good faith and fair dealing.
 
 
 13
 Robert Semrad of CA met with Mark Hungerford of State Medical in Chicago on June 21, 1984 to see if the guarantee issue could be resolved. The result of this key meeting was hotly disputed at trial. Semrad testified that the following agreement was reached: State Medical's principals would not have to execute guarantees; CA would not send the new equipment; and the existing equipment would be leased at the $13,095 rate. Hungerford testified that the meeting produced no agreement but only the possibility of an agreement.
 
 
 14
 In July of 1984, State Medical wrote a check to CA in the amount of $13,095, which CA cashed. In August of 1984 State Medical notified CA that it would stop paying rent. State Medical still held onto the equipment for a period of three months during which it did not pay rent. In November of 1984, CA paid INB for the three months' rent. The three months' use of the equipment by State Medical without payment was the focus of CA's unjust enrichment claim.
 
 
 15
 CA later learned that during May and June of 1984 State Medical had been dealing with Inspiron, a competitor of CA. On June 24, 1984, three days after the meeting in Chicago, State Medical's Comptroller recommended that State Medical should neither "complete nor terminate CA agreement at this time. It is my suggestion that we pursue obtaining a full lease with Inspiron for all necessary liquid equipment and upon receiving a favorable lease, I think we should dump CA down the tubes."
 
 
 16
 CA, along with Beatrice and INB, filed this lawsuit against State Medical in November of 1984. In March of 1985, Beatrice sold Cryogenic Associates. At the same time, it paid its obligation to INB under the Recourse Agreement. In exchange for the payment, INB transferred to Beatrice "the Lease, the Equipment and the transaction and all of INB's rights with respect thereto." This exchange was memorialized in the Purchase Agreement. Ten days before trial, State Medical moved to dismiss INB as a party on the ground that it was not a real party in interest. The motion, unopposed, was granted during trial.
 
 DISCUSSION
 
 17
 I. The Assignment.
 
 
 18
 The first question we face is whether the March, 1985 Purchase Agreement assigned INB's breach of contract, breach of good faith, and unjust enrichment claims against State Medical to CA. State Medical argues that the agreement assigned only claims against Montana Medical, the original lessee from INB. INB was dismissed before trial by stipulation of all the parties. If State Medical's position on this issue is accepted, the verdict should be vacated and the action should be dismissed.
 
 
 19
 The jury did not decide what was assigned to CA because of the way the special verdict form was drafted. The jury was asked to determine if there was an assignment of claims against State Medical to CA only if it first found that there was a contract between INB and State Medical. It checked the "no" box by that question. In its post-trial memorandum opinion, the trial court decided the assignment issue itself, apparently on the grounds that State Medical had not made the objection to the special verdict form required by Rule 49(a) of the Federal Rules of Civil Procedure.[1] But a fair reading of the record indicates that State Medical did object timely. The issue should have gone to the jury if there was evidence in the record that would warrant its submission.
 
 
 20
 State Medical argues that the Purchase Agreement transferred only INB's rights arising directly out of the Montana Medical lease and that any claims INB might have against State Medical for post-March 1, 1984, events (the date of termination of the Montana medical lease) were not assigned. State Medical asserts that the Purchase Agreement, when read together with the Recourse Agreement of December, 1982, set forth the assignment terms unambiguously. State Medical then argues that because the Purchase Agreement is unambiguous on its face, the parol evidence rule requires the court to rule on the assignment issue by considering only the face of the agreement. State Medical is mistaken about the application of the parol evidence rule. It does not apply in a controversy between a party to the contract and a stranger. Read v. Lewis & Clark County, 55 Mont. 412, 178 P. 177 (1919).
 
 
 21
 All of the evidence relevant to INB and CA's understanding of the Purchase Agreement and the Recourse Agreement, including the parties' course of conduct under the agreements, points inescapably to the conclusion that INB transferred all of its claims including those against State Medical to CA. The officers of Beatrice and CA testified that the parties understood that the Purchase Agreement transferred to CA all of the Bank's claims, all of its rights and all of its obligations, arising from both the Montana Medical and State Medical transactions. Paragraph five of the Recourse Agreement lends further support to CA's and INB's understanding of their deal. It says, "CA also agrees that INB may transfer the equipment to a new obligor with CA's consent ..." This language indicates that INB and CA recognized as early as 1983 that Montana Medical might not be the only obligor under the lease. In addition, consistent with the Recourse Agreement, CA paid money to INB in November, 1984 for the rents that State Medical failed to pay to INB during the period after the breakdown of the negotiations for the long-term contract. This indicates that CA and INB understood that CA assumed the same role as guarantor with respect to State Medical as it did with respect to Montana Medical. Most importantly, Beatrice, CA, and INB acquiesced in the dismissal of INB as a party to this lawsuit. Had Beatrice and CA not understood the Purchase Agreement to transfer all of INB's legal claims--those flowing from the attempts to replace the Montana Medical lease with the State Medical lease as well as those flowing directly from the Montana Medical lease--their acquiescence in the dismissal of INB as a party lacking a real interest would be wholly irrational. On this evidence, no reasonable trier of fact could conclude that INB had not assigned its claims against State Medical to Beatrice and CA. We conclude the failure to submit this issue to the jury was harmless beyond all doubt.
 
 
 22
 II. Breach of the Covenant of Good Faith and Fair Dealing.
 
 
 23
 At trial the key controversies were (1) whether in the June 1984 meeting between CA and State Medical the parties agreed on the terms of a long-term lease; (2) whether State Medical acted in bad faith in following the suggestion of its comptroller to neither "complete nor terminate [the] CA agreement" but rather to leave CA hanging until it completed negotiations with a competitor to secure replacement equipment.
 
 
 24
 When the jury returned its verdict, it answered "no" to the first interrogatory, "Was a contract entered into between State Medical Oxygen & Supply and INB," and it answered "yes" to the seventh interrogatory, "Did State Medical Oxygen & Supply, Inc. fail to deal fairly and in good faith with the Plaintiffs." State Medical argues that the answers are inconsistent because a covenant to deal in good faith arises out of an existing contract between parties. State Medical demands a new trial.
 
 
 25
 If the jury's answers to special interrogatories propounded under Rule 49(a) are inconsistent with one another, the court must order a new trial. See cases collected in Wright and Miller, Federal Practice and Procedure Civil § 2510. Rule 49(b) in a perfectly analogous situation provides, "[w]hen the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial." But before a court finds answers to be inconsistent, it must engage in "exegesis, if necessary," to harmonize them. Gallick v. Baltimore & Ohio R. Co., 372 U.S. 108, 119 (1963). Such an exegesis requires the court to examine the interrogatories, the jury instructions and the evidence. See Gallick, supra.
 
 
 26
 The district court in its memorandum opinion upholding the jury's verdict held that Montana law does not require a defendant to be in a contractual relationship with the plaintiff in order for it to be liable for breach of the implied covenant of good faith and fair dealing.
 
 
 27
 We do not decide whether this reading of Montana law is accurate, since the jury's answers to the special verdict can be harmonized. Before trial, the parties agreed to the following facts and the jury was so instructed:
 
 
 28
 12. On or about May 1, 1984, Plaintiffs and State Medical reached an agreement and thereafter substantially all the lease documents between INB and State Medical were executed by State Medical. The new lease agreement contained a reduced total price and included additional equipment[.]
 
 
 29
 13. Plaintiffs and Defendants owed to each other the duty of good faith and fair dealing.
 
 
 30
 The jury could have read Agreed Facts Nos. 12 and 13 to mean that in May of 1984 the parties reached an understanding, not necessarily as to all the final terms of the proposed long-term lease, but at least as to one item--namely, that from then on the parties would bargain and deal with each other in good faith. In the interim State Medical could have the use of the equipment on a month-to-month rental to enable it to service its customers. If a subsequent agreement could not be reached, it would only be because one party could honestly not accept the terms the other was proposing, not because one party might find it advantageous to prolong the status quo, month-to-month arrangement with secretive and dilatory tactics until it had a firm commitment from another supplier. Because according to the Agreed Facts, the parties explicitly agreed to be bound by a higher standard than the law might otherwise require of parties negotiating with each other but who have not reached a final agreement on substantive terms, there is no need for us to ask whether there was an implied covenant. Although the jury instructions made no distinction between an implied covenant and an explicit covenant, the instruction on what constitutes a violation of the covenant is the same regardless of the technical source of the covenant.
 
 
 31
 State Medical argues that because of the dismissal of INB, Agreed Facts Nos. 12 and 13 are irrelevant. We in effect rejected this argument when we determined that Beatrice/CA received an assignment of INB's claims and stood in INB's shoes.
 
 
 32
 In sum, the jury could have found that (1) no long-term lease contract was entered into; (2) the parties agreed to negotiate with each other in good faith; (3) that State Medical failed to abide by this agreement; and (4) that State Medical was unjustly enriched during the period in which it held onto equipment and did not pay rent. None of these findings are inconsistent with each other or contrary to law.
 
 
 33
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the Courts of this Circuit except as provided by Circuit Rule 36-3
 
 
 [1]
 The trial judge did not cite to Rule 49(a), but that appears to be the basis of his decision